[No. 732.   Decided May 8, 1893.]

M. C. SOULE, *Respondent*, v. THE CITY OF SEATTLE, *Appellant*.

MUNICIPAL CORPORATIONS — STREET IMPROVEMENTS — PAYMENT
OUT OF SPECIAL FUND — LIABILITY OF CITY — INTEREST.

Where, under authority of its charter, an ordinance of the city provides that certain classes of street improvements shall be paid for by special assessment against the property fronting thereon, such provisions become a part of the contract, and the persons contracting to make such improvements must look to payment from a special fund; and the remedy of the contractor remains the same although the charter provisions under which the improvement was made have been superseded.

Where a city has already reached its constitutional limit of indebtedness, it has no power to render itself liable for the cost of street improvements contracted for subsequent thereto, even although the city fails to levy an assessment and provide a special fund for such improvement, as it is required by ordinance to do.

Where city officials have issued warrants upon a special fund which was to be collected from property benefited by the construction of street improvements, the city is not liable for interest thereon, until the delinquency of the assessments made for such improvements.

*Appeal from Superior Court, King County.*

*George Donworth*, and *James B. Howe*, for appellant.

*Blaine & De Vries*, for respondent.

The opinion of the court was delivered by

STILES, J. — After the decision of this court in *Wilson v. Seattle*, 2 Wash. 543 (27 Pac. Rep. 474), respondent, as assignee of the contractor for the work on South Twelfth street, brought a suit against the city, setting out the facts showing the issuance to his assignor of a large number of city warrants as partial payment of his claim for the work done in grading, sidewalking and guttering the street, their

non-payment, and the failure of the city to provide any fund for their payment by means of a special assessment. The complaint was addressed to the equity side of the court, and prayed judgment for the face of the warrants and interest, and for further relief in equity. The judgment was for the full amount claimed, and for a warrant to be issued by said city of Seattle as provided by law.

The city appealing makes numerous objections, the most important of which are summed up in the proposition that it could in no such event as has here transpired, under the law, be held liable for the cost of work done in grading South Twelfth street. It is maintained that § 7 of the charter of 1886 referred only to repairs of streets, while § 8 provided for new grading; that § 8 expressed the only power the city had to grade, and, as the means therein mentioned for paying the cost were local assessments, there was no other source to which a contractor could look; that the city was the mere agent of the property holders, and that only to the extent of furnishing officers to levy and collect assessments; and that no liability could in any event attach to the city at large, or, at least, not until there was a positive refusal to make an assessment, or such delay or other circumstance as would lose to the contractor his compensation for his work and materials.

There are cases which go to the extent of holding that, where there was either lack of statutory power, or a failure to acquire jurisdiction of the subject matter, a municipal corporation must be entirely absolved from paying such claims. *Hunt v. City of Utica*, 18 N. Y. 442; *Swift v. City of Williamsburgh*, 24 Barb. 427; *City of Leavenworth v. Rankin*, 2 Kan. 357; *Goodrich v. City of Detroit*, 12 Mich. 279; *Johnson v. Indianapolis*, 16 Ind. 227; *Bond v. Mayor, etc., of Newark*, 19 N. J. Eq. 376.

But it is beyond all question, it seems to us, that the city in this instance was not limited to special assessments as a

means of improving its streets in any way it saw fit.    Section 7, by its terms, covered every imaginable improvement, and for such purposes it could borrow money under the provisions of § 24.    The authority of § 8 was merely permissive, and was probably expressed solely for the reason that, unless expressed, it could have no existence.    The charter of the city of Memphis contained the substance of all there was in these two sections — 7 and 8 — and in reference to it, the United States supreme court said:

"General power and authority over the subject is by law given the city, and the power also vested in the city to require that the cost may be assessed upon the adjoining owner, does not impair the power of the city itself to do the work.  .  .  .    The city may require the owner to pay, but it is not compelled to do so."  *City of Memphis v. Brown*, 20 Wall. 289–310.

To the same effect is *Hitchcock v. Galveston*, 96 U. S. 341.    In *Portland, etc., Mfg. Co. v. East Portland*, 18 Or. 21 (22 Pac. Rep. 536), the statute construed would seem to read almost in the form in which appellant contends that this one should be construed; but the agreed price for the material used in the improvement of the street was held to be recoverable, where warrants had been issued payable out of a fund to be collected from assessments, but the fund had not been provided.    The concurring opinion of LORD, J., is devoted to a clear showing of the distinction between the general power to improve streets and the special power to do so by local assessments.    The able dissenting opinion of THAYER, J., is based entirely upon the fact that in his view the only power expressed was to improve by local assessments.

But it would not be profitable to pursue this matter further, since in the case before us there are other elements in it which are decisive.

Section 8 of the charter contained little in addition to

the conference of power to levy special assessments; but § 10 gave the city authority, by ordinance, to prescribe the method of assessing and collecting such taxes; and the city, availing itself of its alternative authority in the premises, by ordinance 737, adopted in 1886, elected to make all of certain classes of street improvements by the method of special assessments, and regulated the proceedings for levying and collecting the same. Section 2 of that ordinance reads as follows:

"Whenever the common council of the city of Seattle shall cause any part of any street, highway or alley therein to be curbed, paved, graded, macadamized or guttered, or any sidewalk to be constructed in any such street, highway or alley, the whole cost of such improvement shall be levied and become a lien upon the taxable real estate fronting on the part of such street, highway or alley so improved and within the assessment district to be established as hereinafter provided."

The eighth section provided that when an assessment had been ordered paid to a contractor, a duplicate of the roll should be delivered to him, so that he might collect or foreclose in accordance with the statute. This ordinance became a general law of the city, and was fair notice to all persons dealing with it in such matters, that contracts for street grading and sidewalks would be paid out of special assessments, and not from the street fund or general fund.

Again, at the time this improvement was ordered and the contract made, the constitutional restrictions upon municipal indebtedness were in force, and it appears in the case that although the city of Seattle was limited to one and one-half per cent. on about sixteen millions, she already had out her obligations for upwards of four hundred thousand dollars, an amount far beyond her lawful indebtedness. This condition of things any one contracting with her was bound to know; so, if ordinance 737 was not fully

explicit in limiting the recourse of the respondent's assignor to the special assessment to be levied upon South Twelfth street property, he must be taken to have been aware that at the date of his contract the power of the city to agree, either expressly or impliedly, or by way of original liability, or as guarantor, to pay him any sum was completely gone, unless, perhaps, by express assignment of current revenue.

But the respondent endeavors to avoid this turn of affairs by two arguments: (1) That he has a right to recover damages for the failure to levy the assessment and procure the fund. (2) That he had no remedy whatever when he brought his suit.

On the first point we are not with him. This is not an action against officers for the neglect of a duty whereby irreparable loss has occurred. If he could recover at all, it must be upon the contract of his assignor, or upon his warrants. The contract called for payment "out of a special fund created for that purpose;" and the warrants directed the treasurer to pay them "out of South Twelfth street improvement funds, under ordinance No. 1413, not otherwise appropriated." No other considerations intervening, if the fund failed, the *implied* agreement would be to pay absolutely. It is true that the debt limits imposed upon municipal corporations are held not to apply where one suffers a wrong at their hands which is *ex delictu;* but, whatever might be held to be the character of this action, it is not based upon a tort, but upon a voluntary delin_quency. Plainly, if such cases as this were to be allowed to fall within the principles governing accidents due to the bad condition of streets, there might as well be an end to all restrictive legislation upon the power of cities to incur debt. Constitutions and acts of the legislature would be of as little preventive force as cobwebs in a cyclone.

Concerning the remedy. Having contracted with Smart, the statute and ordinance 737 became a part of the contract, which neither the state nor the city could alter in any substantial particular so as to jeopardize the payment of the contract price of the work. There must be an assessment of this property to pay for this work, and if the law which was a part of this contract had been entirely swept away and no other substantial provision made, the courts would still be bound to interfere, even to the extent of themselves making and enforcing the assessment if there were no proper officers of the city to perform that work. But the new city charter of 1890, which went into operation pending the performance of this contract, put no obstacles whatever in the way of making such an assessment. A change was made in the method of assessment, viz., from valuation to frontage, and the city now pays for street intersections; the former was an immaterial change in the remedy so far as the contractor was concerned, but the latter was of interest to him inasmuch as he might have to rely upon a fund which was already overdrawn. He was entitled to have the assessment for the whole cost of the work spread over the same property that was liable for it under the law governing his contract.

The record shows that after the case of *Wilson v. Seattle* was decided, no steps were taken looking toward a new assessment; but an amendment to the charter, providing for new assessments in such cases, was made March 8, 1892, after the commencement of this action. An act of the legislature approved March 9, 1893, confirmed this amendment and provided a concurrent remedy in such cases; this act went into effect immediately.

The delay in making a new assessment for this improvement is shown to have been due to the doubt which the officials of the city of Seattle had as to the legality of such

a proceeding, even after the adoption of the charter amendment, without special authority from the legislature. But where, as in this case, the jurisdiction of the corporation to order and contract for the improvement is unquestioned, and where that jurisdiction was regularly exercised, and the work was done, we can discover no valid reason for holding that the power of the city to levy and collect the assessment was exhausted by the abortive effort which resulted in the *Wilson* case. The charter of 1886 being permissive, and having left the regulation of all details to the council, none of the provisions of ordinance 737 prescribing the time within which the several steps for the assessment must be taken could be said to be mandatory, unless it be the single one of notice to property owners. But the entire proceedings looking to the assessment having been held void for want of the notice, the record of an assessment was cleared, and no person could object if new proceedings were instituted and regularly pursued. This would not be a re-assessment of property once legally charged, as sometimes occurs to make up a deficiency, but a new proceeding from the beginning, such as has been sustained by authority. *Pond v. Negus*, 3 Mass. 230; *Hines v. City of Leavenworth*, 3 Kan. 186; *Himmelmann v. Cofran*, 36 Cal. 411.

We agree with the last named case in holding that it was the right of the contractor to have a valid assessment laid upon the property benefited, and this was a right which could not be taken away by a change in the law amounting to a deprivation of the right to be paid, or by any neglect or failure of the officers of the city. It seems, however, that the course of the city in this case has not been one of neglect, except in the matter of the notice in the first instance. After the decision in the *Wilson* case the delay arose entirely from honest doubt as to the law of the case, in which the respondent seems to have shared, inasmuch as he never

21—6 WASH.

moved to have a new assessment made.  Under these cir-
cumstances we do not think the respondent was entitled to
the judgment awarded him; but in so concluding we desire
to have it understood that the controlling reasons of this
decision are the peculiar provisions of the charter of 1886,
which left it to the city to regulate special assessments, the
terms of the contract with Smart, and the fact that in June,
1890, the city of Seattle was prohibited from making an
open contract for such street work, by reason of the debt
limit of one and one-half per cent., which it had largely ex-
ceeded.  We leave it an entirely open question whether
municipalities may not, under different circumstances,
make themselves liable by omissions of the character pre-
sented here.

Whether the action of the mayor, clerk and comptroller
in issuing warrants to Smart, the contractor, in advance of
the collection of the assessment was regular or not, we are
unable to say, as the ordinances of the city on this subject
are not in the record.  But, however that may be, they are
not entitled to even that amount of consideration which at-
taches to the general warrant of such a corporation upon
its treasury.  The contract in this case, as has been said,
called for payment out of a special fund to be created, but
no time was stated; and a subsequent clause provided that
"warrants" should be issued to Smart, at the first regular
meeting of the common council in each month from July
to December, inclusive, for seventy-five per cent. of the con-
tract price of work completed during the preceding month,
and for the balance at the first meeting of the council after
the completion of the work and its approval by the city
surveyor.  The warrants before us were issued in the last
four months, and respondent claimed and was allowed in-
terest at ten per cent. upon each of them from the date of
its presentation to the treasurer within a few days of its
issue.  Obviously this was an error, even though the city

were fully responsible, for when the contract was made it must have been understood that payment was not due until the special fund could be realized upon, and this might require not only the time limited by ordinance 737 for a collection by voluntary payment, which ran to about March 8, 1891, but also the time necessary for the foreclosure of the assessments where payment was not made voluntarily. Such portions of the assessments as might be collected from time to time the contractor was entitled to immediately; but no assessment of the tax could be made under this ordinance until the work was completed; and this the contractor must have had in mind when he made his bid. These "warrants," therefore, must be regarded as mere partial certificates without negotiable quality, showing the right of the holder to participate in the fund to which they refer when it is realized. We speak of the "holder," because the form in which they were put, the contract and the course of business seemed to contemplate that they were to pass by assignment. *Dorian v. City of Shreveport*, 28 Fed. Rep. 287; *Mayor v. Ray*, 19 Wall. 468.

Equity would say, we think, that interest should be paid upon these warrants from the date when the city would itself have been entitled to collect interest, that is, after delinquency upon the assessment March 8, 1891, but not earlier. Certainly no obligation could be laid upon the city to pay interest before that time, for until then it was in no wise in default, in any view which could be taken of the case.

Judgment reversed, and remanded for dismissal of the cause.

SCOTT and ANDERS, JJ., concur.

HOYT, J.—I concur in the result, but not in what is said as to the right of the city to elect whether it will improve

its streets by a general tax or by local assessments, as to which question I express no opinion.

DUNBAR, C. J. (*dissenting*).—I dissent. The judgment, in my opinion, on every principle of fair dealing, is right, and should be affirmed.

### ON PETITION FOR RE-HEARING.

STILES, J.—Counsel for respondent in this case urges, upon a petition for re-hearing, that this court erred in assuming as a fact in its opinion heretofore filed, that at the time of making the contract for the grading of South Twelfth street the city of Seattle had reached its constitutional limit of indebtedness. The facts are these: The answer of the city set up the fact that the constitutional limit had been reached as one of its defenses, and to this defense the plaintiff interposed a demurrer, which was sustained by the court; but upon the trial, notwithstanding this defense had been shut out, counsel for the city offered to prove the fact. Errors were assigned upon the action of the court in sustaining the demurrer, and in shutting out the proof.

In disposing of the case on appeal, this court found the action of the court below to be error, and had that fact been the only point in the case it would have gone back for re-trial. But the main point upon which the case was decided was that the respondent had mistaken his remedy, by reason of the fact that his contract with the city was of such a character that it would not justify the charge of negligence against the city until it had been fully moved to levy and collect a local assessment to pay for the work. This ground alone, in our judgment, authorized the dismissal of the case. The other matters discussed were in the case, but were not absolutely necessary to its decision upon the merits. It cannot be questioned that, in argument, we were justified in assuming the fact of the city's

having reached its debt limit to be true, since the demurrer of the plaintiff to the answer on that subject was an admission of the truth of the fact as alleged. We are entirely satisfied with the disposal of the other points.

The petition for re-hearing is denied.

HOYT, SCOTT and ANDERS, JJ., concur.